No. 119,749

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

REGINALD A. KANE,
*Appellant*.


SYLLABUS BY THE COURT

1.

When a defendant challenges the sufficiency of the evidence presented at trial, appellate courts defer to the jury's apparent factual findings by reviewing the evidence in the light most favorable to the prosecution. An appellate court will not set aside a conviction for insufficient evidence if the court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.

2.

For the evidence to be sufficient to support a challenged conviction, there must be evidence presented at trial to support each element of the crime.

3.

To prove attempted first-degree murder, the State must prove the defendant (1) attempted to commit a premeditated murder of a human being; (2) took an overt act toward perpetrating that murder; and (3) failed to complete the crime.

4.

Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct. Premeditation requires some opportunity for reflection or deliberation—to have thought the matter over beforehand—though an act need not have been planned beforehand to be premeditated.

5.

The State is not required to present direct evidence of either intent or premeditation. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable.

6.

Premeditation may be proved by circumstantial evidence. Fact-finders and courts called on to evaluate premeditation circumstantially consider, among other matters, (1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. Not all of these considerations are relevant in every instance, and some carry more weight than others under the facts of a particular case.

7.

K.S.A. 2018 Supp. 21-5408(a)(2) defines kidnapping as "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person . . . to facilitate flight or the commission of any crime."

8.

If a taking or confinement is alleged to have been done to facilitate the commission of another crime, to prove kidnapping, evidence must show that the resulting movement or confinement (1) must not be slight, inconsequential, and merely incidental

2

to the other crime; (2) must not be of the kind inherent in the nature of the other crime; and (3) must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

9.

This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position.

10.

A court may find a taking or confinement has independent significance from another crime for purposes of the kidnapping statute not only when an act actually makes a crime substantially easier to commit but also when the act has the potential to do so, even if the defendant never received the anticipated benefit. It is the nature of the act, not its result, that is legally important.

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed November 27, 2019. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., HILL and WARNER, JJ.

WARNER, J.: Reginald Kane robbed a restaurant, during which he escorted an employee at gunpoint into the restaurant and shot the restaurant's owner while leaving. The State charged Kane with various offenses, including attempted first-degree murder and kidnapping, and a jury found him guilty of all crimes charged. On appeal, Kane seeks

to overturn his attempted first-degree murder and kidnapping convictions, arguing insufficient evidence exists to support them. We find that the evidence, viewed in the light most favorable to the State, is sufficient to support his convictions and affirm.

FACTUAL BACKGROUND

By 9 p.m. on June 9, 2017, Ruben's Mexican Grill in Wichita had closed and its doors locked. Four employees remained inside: Ruben Acosta, the owner, was at the front of the restaurant counting money at the cash register counter, under which he kept a .38 revolver. Umberto Fernandez, Boris Guzman-Mendoza, and Jose Trejos-Gonzales were cleaning in the back of the restaurant. Trejos-Gonzales was washing dishes at a sink next to the restaurant's back entrance.

At around 10 p.m., Fernandez propped open the back door and went outside to throw trash in the dumpster. Kane, wearing black clothing and a black mask, approached Fernandez, placed a semiautomatic pistol to his back, and said, "Money." Kane took Fernandez inside the restaurant through the back door, where they encountered Trejos-Gonzales. Upon reentering, Fernandez screamed that somebody was in the restaurant and then escaped through a side door.

Kane then turned his pistol on Trejos-Gonzales. He repeated, "Money," and began escorting Trejos-Gonzales to the front of the restaurant. When Kane and Trejos-Gonzales came upon Guzman-Mendoza, Kane again said, "Money." He then urged both employees forward. Once in the front, Kane approached Acosta, aimed the gun at Acosta's forehead, demanded money, and took the money and a bank bag lying on the counter.

The witnesses' accounts differ as to how the ensuing gunfight began:

4

- Trejos-Gonzales testified that as Kane walked away with the money, he dropped the bank bag and turned around to pick it up. Then Kane and Acosta began shooting at each other, though Trejos-Gonzales did not know who fired first.

- Guzman-Mendoza testified Kane took the money and began to leave, but returned to the counter to take a blue bank bag. Kane then started to leave again and fired from about 5 or 10 paces from Acosta. Guzman-Mendoza did not know, however, if Kane fired *at* Acosta.

- Acosta testified Kane took the money and the bank bag and began walking away. Kane then turned around and said, "Sorry, is the last day you will see this world, you mother fucker," and shot at him. Kane's shot went several feet over Acosta's head, and Acosta retrieved his revolver and fired back. During the exchange of shots, Acosta shot Kane, who dropped the money before running out the back door. Kane shot Acosta twice before Acosta collapsed.

Police arrived at the restaurant and transported Acosta to the hospital. While examining the scene, officers collected 15 empty 9mm casings. At about 10:20 p.m., police responded to a call of another shooting at Kane's apartment. Officers transported Kane to the hospital after finding him on his front porch with a gunshot wound. Inside the apartment, officers found a manual for a 9mm Glock 17 handgun, a gun cleaning kit, multiple gun holsters, and a 9mm hard gun case, but no gun. They also found blood-soaked black clothing that matched the description of the clothes the robber had been wearing. Various witnesses, including Kane's girlfriend, provided statements tying Kane to the robbery at Ruben's. Finally, the bullet recovered from Kane's abdomen was a .38—the same caliber Acosta fired from his revolver.

Kane was charged with multiple offenses arising from the robbery and accompanying acts. The case went to trial on aggravated robbery, aggravated burglary,

aggravated battery, attempted first-degree murder, kidnapping, three counts of aggravated assault, and criminal possession of a weapon, and the jury convicted Kane on all charges. He now appeals, arguing there was insufficient evidence to convict him of kidnapping (associated with forcing Fernandez into the restaurant's back door at gunpoint) and attempted first-degree murder (for threatening and shooting at Acosta).

DISCUSSION

Appellate courts are courts of review. Appellate judges are not present to hear witnesses' testimony, to observe their demeanor, or to weigh that testimony against the other evidence presented at a trial. Thus, appellate courts "'do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations'" when a case is challenged on appeal. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). Instead, we rely on juries to observe and listen to the witnesses and to render a verdict based on the jurors' assessment of the evidence presented.

For these reasons, when a defendant in a criminal case challenges his or her conviction by questioning the sufficiency of the evidence presented at trial, appellate courts defer to the jury's apparent factual findings by "'reviewing all the evidence in the light most favorable to the prosecution.'" 307 Kan. at 668. An appellate court will not set aside a conviction for insufficient evidence if the court "'is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" 307 Kan. at 668.

This does not mean, however, that appellate review of the evidence's sufficiency is meaningless. Rather, for the evidence below to have been sufficient, "there must be evidence supporting each element of a crime." *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014). Here, Kane argues there was insufficient evidence to prove an element of each of the two convictions he challenges. In particular, he asserts no credible evidence presented at trial shows premeditation (an element of attempted first-degree

6

murder). Kane also argues there was insufficient evidence of kidnapping because his interactions with Fernandez did not facilitate the robbery as required by K.S.A. 2018 Supp. 21-5408(a)(2). We consider each of these claims in turn.

1. *There was sufficient evidence presented at trial to support Kane's attempted first-degree murder conviction.*

To prove attempted first-degree murder, the State had to show Kane (1) attempted to commit a premeditated murder of a human being; (2) took an overt act toward perpetrating that murder; and (3) failed to complete the crime. *State v. Wilson,* 30 Kan. App. 2d 498, 499-500, 43 P.3d 851, *rev. denied* 274 Kan 1118 (2002). Kane claims there was insufficient evidence to convict him of this offense, arguing neither direct proof nor circumstantial evidence of premeditation exists to sustain his conviction.

"Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct." *State v. Scott*, 271 Kan. 103, 108, 21 P.3d 516 (2001). Premeditation requires some opportunity for reflection or deliberation—"to have thought the matter over beforehand"—though an act need not have been *planned* beforehand to be premeditated. *Kettler*, 299 Kan. at 466; see *Scott*, 271 Kan. at 108; PIK Crim. 4th 54.150 (2018 Supp.).

The State need not present direct evidence of premeditation. *Kettler*, 299 Kan. at 466. "Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable." 299 Kan. at 467. That is, "[i]ntent . . . may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his acts." *State v. Childers*, 222 Kan. 32, 37, 563 P.2d 999 (1977).

In practice, premeditation is often proven by circumstantial evidence. *State v. Doyle*, 272 Kan. 1157, 1162, 38 P.3d 650 (2002). Fact-finders and courts called on to

evaluate premeditation circumstantially consider, among other matters, "(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless." *State v. Scaife*, 286 Kan. 614, 617-18, 186 P.3d 755 (2008). Not all of these considerations are relevant in every instance, and some carry more weight than others under the facts of a particular case. *State v. Smith-Parker*, 301 Kan. 132, 153, 340 P.3d 485 (2014).

Here, the State presented both direct and circumstantial evidence of Kane's premeditation. Most significantly, Acosta testified that Kane told him that it was "the last day [Acosta] will see this world" before he shot in his direction. Kane attempts to discredit the testimony, noting neither Guzman-Mendoza nor Trejos-Gonzales corroborated this statement and Acosta's preliminary statement did not describe this threat. But it is not the province of this court to resolve evidentiary conflicts or reassess witnesses' credibility. *Chandler*, 307 Kan. at 668. The jury had the opportunity to hear Acosta's testimony and evaluate the veracity of his account—especially when Kane highlighted on cross-examination the difference between Acosta's testimony at trial and at the preliminary hearing. Viewing this evidence in the light most favorable to the State, Kane's threat provides sufficient proof of premeditation for the attempted first-degree murder charge.

The record also includes circumstantial evidence of premeditation. While many circumstances the State includes in its brief could be attributed to the robbery itself— carrying a semiautomatic pistol, wearing black, using the pistol to convince the restaurant employees to give him the bag of money—Acosta testified that Kane fired first without provocation and that Acosta only acted after Kane fired at him. The jury considered this testimony and apparently found it credible; we will not second-guess the assessment of those who heard the evidence first-hand. 307 Kan. at 668.

8

Kane did not need to fire his pistol to rob the restaurant. The robbery was accomplished before any shots were fired. But instead of leaving with the money, Acosta testified that Kane stopped, turned, and fired his gun in Acosta's direction. Kane argues he only meant to intimidate Acosta; he asserts that, had he intended to shoot Acosta, he would not have shot several feet over Acosta's head from such a close range. But a juror certainly could have come to a different conclusion: that Kane attempted to shoot Acosta but missed under the turmoil of the moment. This sequence of events, viewed in the light most favorable to the State, could cause a rational juror to conclude Kane decided to shoot Acosta as he was leaving the restaurant.

It is not the role of this court to reweigh the evidence or substitute our judgment for the jurors' credibility determinations. Viewed in the light most favorable to the State, there was sufficient evidence to support the jury's finding of premeditation. We therefore affirm Kane's conviction for attempted first-degree murder.

2. *There was sufficient evidence to support Kane's kidnapping conviction.*

Kane was convicted of kidnapping as the crime is defined in K.S.A. 2018 Supp. 21-5408(a)(2): "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person . . . to facilitate flight or the commission of any crime." This statute differentiates between the offending act (a taking or confinement accomplished by force) and its mens rea (the intent to hold such person to facilitate the commission of any crime). Kane asserts there was no evidence that his movement of Fernandez from the dumpster to inside the restaurant facilitated the robbery. Thus, he claims, there was insufficient evidence of an essential element of the crime.

The Kansas Supreme Court discussed this definition of kidnapping at length in *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976). In an effort to differentiate takings

9

severe enough to constitute kidnapping from takings merely incidental to the underlying crime, the *Buggs* court adopted a three-factor test for whether an action "facilitate[s]" the commission of a crime under the kidnapping statute:

> "[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
> (*a*) Must not be slight, inconsequential and merely incidental to the other crime;
> (*b*) Must not be of the kind inherent in the nature of the other crime; and
> (*c*) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

All three of these factors must be proved. See 219 Kan. at 216.

*Buggs* also explained that the distance a person is moved and the length of his or her confinement are only incidental to the kidnapping analysis. 219 Kan. at 214. The court opined the "removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping," but "the removal from a public place to a place of seclusion is." 219 Kan. at 216. Similarly, the "forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is." 219 Kan. at 216.

As a preliminary matter, the State argues that *Buggs* is inconsistent with Kansas' modern approach to statutory interpretation because it adds extra-statutory factors—that the taking must not be "slight, inconsequential[,] and merely incidental"; must not be "inherent in the nature" of the underlying crime; and must "make[] the other crime substantially easier"—to what K.S.A. 2018 Supp. 21-5408(a)(2) requires the State to prove. Kansas courts use a plain-language approach to statutory interpretation. This is because "[t]he most fundamental rule of statutory construction is that the intent of the

10

legislature governs." *State v. Spencer Gifts*, 304 Kan. 755, Syl. ¶ 2, 374 P.3d 680 (2016). And "[r]eliance on the plain and unambiguous language of a statute is the best and only safe rule for determining the intent of the creators of a written law." 304 Kan. 755, Syl. ¶ 2. Thus, assuming the statute's language is constitutional, its plain language "trumps both judicial decisions and the policies advocated by the parties." 304 Kan. 755, Syl. ¶ 2. In other words, appellate courts cannot "speculate" or "read into the statute language not readily found there." 304 Kan. 755, Syl. ¶ 3.

This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). We have no indication—other than general maxims of statutory interpretation—that the Supreme Court would depart from its previous position on the kidnapping statute, so *Buggs* is binding on our analysis. And while we can appreciate the State's concern that the *Buggs* factors are not specifically articulated in the kidnapping statute, we nevertheless note that in adopting this standard, *Buggs* was not adding elements to the crime of kidnapping; it was *interpreting* what it means to "facilitate" a crime under the kidnapping statute. We thus apply the *Buggs* factors to determine whether there was sufficient evidence to support Kane's kidnapping conviction.

The State charged Kane with kidnapping for forcing Fernandez into the restaurant at gunpoint in order to facilitate the commission of the robbery. Neither party contests that a taking occurred. Nor is there any serious question that Kane's actions meet the first two *Buggs* factors. Moving third parties during a robbery who the robber does not intend to rob is not incidental to the robbery. See *State v. Dupree*, No. 88,186, 2003 WL 22831336, at *7 (Kan. App. 2003) (unpublished opinion) (moving children, who were not targets of a robbery, to another room was not incidental to the robbery), *rev. denied* 277 Kan. 926 (2004). And forcibly moving a person is not an element of robbery, so taking

Fernandez was not inherent to the commission of the crime. See K.S.A. 2018 Supp. 21-5420.

But the parties contest whether the evidence in this case meets the third *Buggs* factor—the taking's independent significance. Kane argues that Fernandez's flight upon entering the restaurant provided Kane with little benefit. While he acknowledges *Buggs'* statement that removing a person from a public to a private location can substantially lessen the risk of detection, he argues his actions toward Fernandez did not make the robbery easier to commit, nor did it lessen the risk of detection. Instead, Kane asserts that his actions are more analogous to *Buggs'* example of a robber directing a store clerk to open a cash register.

In contrast, the State asserts that Kane's actions toward Fernandez were not necessarily required to succeed in helping complete the robbery; rather, it is sufficient under Kansas law to show that the kidnapper's effort could have made the crime substantially easier to commit. And the State also points out that forcing Fernandez back into the store at gunpoint could provide several benefits—some potential and some actually recognized here—to Kane's robbery. Caselaw supports this position.

Kansas law provides numerous examples of how an uncompleted or failed taking may satisfy the third factor in *Buggs* if it had the potential to make a crime substantially easier to commit. For example, in *State v. Jackson*, 238 Kan. 793, 714 P.2d 1368 (1986), the defendant attempted but failed to force the victim into his car trunk. In upholding an aggravated kidnapping conviction, the court, in addressing the third *Buggs* factor, reasoned: "Had [the defendant] succeeded in forcing the victim into the trunk, the appellant would have substantially lessened the risk of detection." 238 Kan. at 803. Similarly, in *State v. Royal*, 234 Kan. 218, 670 P.2d 1337 (1983), the court upheld a kidnapping conviction where a woman escaped from the defendant's car after he forced her inside. Noting the defendant moved the woman into his car, the court explained that

12

the fact that she "kept fighting and screaming, and eventually was able to break away, does not lessen the offense." 234 Kan. at 224. See *State v. Weigel*, 228 Kan. 194, 198-99, 612 P.2d 636 (1980) (during bank robbery, placing employees into bank vault but failing to lock the vault was kidnapping because its purpose was to substantially lessen the risk of detection); see also *State v. Ferguson, Washington & Tucker*, 228 Kan. 522, Syl. ¶ 5, 618 P.2d 1186 (1980) ("To be kidnapping . . . the taking of the victim does not have to be essential to the accomplishment of the underlying crime but it is sufficient if the taking is *aimed at* making it easier of accomplishment." [Emphasis added.]).

These cases indicate that a court may find independent significance not only when an act *actually* makes a crime substantially easier to commit but also when the act has the *potential* to do so, even if the defendant never received the anticipated benefit. It is the nature of the act, not its result, that is legally important. Thus, whether the taking here would make the robbery substantially easier to commit or would substantially reduce the risk of detection should be viewed from Kane's perspective when he forced Fernandez into the restaurant at gunpoint—not with the benefit of hindsight, now knowing that Fernandez was able to get away.

Moving Fernandez from a public alley to inside the restaurant substantially decreased the risk of detection; since the restaurant was closed, nobody would happen upon Kane. That Fernandez escaped almost immediately upon reentering the restaurant does not impact the significance of Kane's actions. Had Fernandez not escaped, Kane likely would have continued to confine Fernandez inside, just as he did Guzman-Mendoza and Trejos-Gonzales. By keeping them inside, Kane substantially decreased the likelihood one of them would raise the alarm. And taking Fernandez could have made the robbery substantially easier. Securing others' compliance by threatening Fernandez and ensuring he did not interfere with the robbery are plausible methods by which Kane could have made the robbery substantially easier to commit.

13

Viewed in the light most favorable to the State, there was sufficient evidence to support Kane's kidnapping conviction.

Affirmed.